IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 15-06001-01-CR-SJ-BP |
| FRANCISCO ORTEGA-MONTALVO, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence on the ground that

defendant's roommate did not voluntarily consent to allow agents into his apartment.  I

find that Mr. Maldonado's consent was given voluntarily and without coercion.

Therefore, defendant's motion to suppress should be denied.

## *I.  BACKGROUND*

On December 10, 2014, special agents of the Department of Homeland Security

went to defendant's apartment after verifying a tip that he was in the country illegally,

had previously been deported, and had previously suffered a conviction for aggravated

assault on a law enforcement officer.  They knocked on the apartment door, and

defendant's roommate answered and permitted them to enter.  He told the agents that

defendant was in the back bedroom, the door of which was locked. The agents

conducted a security sweep of the apartment and then knocked on the bedroom door

while announcing their presence.  Defendant opened the bedroom door and was taken

into custody.  Both defendant and his roommate granted oral consent to search the

apartment, and agents seized three identification documents from defendant's

bedroom.  He subsequently waived his <u>Miranda</u> rights and admitted that he had illegally entered the United States after having been deported for a felony aggravated assault conviction.

On December 29, 2014, a complaint was filed charging defendant with unlawful reentry into the United States after having been deported subsequent to a felony conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(2).  An indictment was returned on January 6, 2015, charging the same offense.  Defendant filed the instant motion to suppress on April 5, 2015 (document number 20).  On May 4, 2015, the government filed a response, arguing that the consent given by defendant's roommate to enter the apartment was voluntary (document number 24).

On May 5, 2015, I held an evidentiary hearing on defendant's motion to suppress.  The government appeared by Assistant United States Attorney Roseann Ketchmark.  The defendant was present, represented by Assistant Federal Public Defender Ronna Holloman-Hughes.  The following witnesses testified:

1.    Special Agent Scott Lindsey, Department of Homeland Security

2.    Special Agent Tim Ditter, Department of Homeland Security

3.    Special Agent Jose Covarrubias, Department of Homeland Security

4.    Juan Maldonado, defendant's roommate

In addition, the following exhibits were admitted:

P. Ex. 1    Photograph of the area of the apartment complex where defendant's building was located, aerial photograph showing defendant's apartment building, and satellite-style photograph of apartment building and surrounding buildings and parking lots

2

P. Ex. 2          Copy of Arkansas drivers license in the name of Francisco Ortega-Montalvo, Mexican Federal Electoral voter registration card in the name of Francisco Ortega-Montalvo, and "Clave Unica De Registro De Poblacion" (an identity code for citizens and residents of Mexico) in the name of Francisco Ortega-Montalvo

P. Ex. 3          U.S. Department of Homeland Security Form I-215B, affidavit including advice of <u>Miranda</u> rights and waiver, signed by defendant

P. Ex. 4          Sworn statement of previously deported alien, signed by defendant on December 10, 2014

P. Ex. 5          Photograph taken of defendant during his previous immigration case and shown to officers prior to the incident in this case

## II.    *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.      The Department of Homeland Security received a Homeland Security Investigation ("HSI") Tip Line report from a police officer in Platte City, Missouri, which indicated that someone had reported to the officer that defendant Francisco Ortega-Montalvo was working at Maria's Mexican Restaurant in Platte City, that he was a previously deported alien who had been convicted of an aggravated felony, that he drove a white truck with Arkansas license plates 087-MID, and that he was using the name Jerry Ortega (Tr. at 9, 12). Special Agent Scott Lindsey ran several records and database checks and was able to corroborate the name, the Arkansas truck license plate and the criminal history that had been reported on the HSI Tip Line (Tr. at 11). He found that the pickup license plate number that had been provided was registered to Francisco Ortega (Tr. at 10). A national database showed that an individual by the name of Francisco Ortega was living in an apartment in Platte City (Tr. at 10). Special

3

Agent Lindsey learned that an individual named Francisco Ortega-Montalvo had previously been deported from the United States for the felony of aggravated assault (Tr. at 10). A Conway, Arkansas, police report showed that a Francisco Ortega-Montalvo had been arrested for assaulting a police officer, and conviction documents showed that he was convicted of aggravated assault on the police officer (Tr. at 11). The police report stated that defendant had come out of his home and shot at a police officer (Tr. at 34). Defendant served 54 months in prison for this conviction prior to being deported (Tr. at 35).

2. Special Agent Lindsey went to the area of the restaurant and observed the white truck in the parking lot (Tr. at 11). The license plate on the truck matched the one given on the Tip Line (Tr. at 11). Special Agent Lindsey discussed the situation with his group supervisor; and because they did not know defendant's schedule at the restaurant and did not want to alert him to the fact that they intended to arrest him, they decided not to attempt to find him at the restaurant (Tr. at 13).

3. Special Agent Lindsey contacted the Platte City police department and requested the assistance of two officers (Tr. at 13). Those police officers met with six HSI special agents on December 10, 2014, and held an informal briefing (Tr. at 13-15, 39-40, 64). While this was going on, another HSI officer was at the apartment complex and verified that defendant's white truck was parked at the apartment complex near the building where defendant was believed to be residing (Tr. at 14-15).

4. During the informal briefing, Special Agent Lindsey told the other officers about defendant's criminal history, that he was a previously-removed alien after suffering an aggravated felony conviction, and that his conviction was based on

4

aggravated assault of a police officer (Tr. at 15, 41, 55, 64). Special Agent Lindsey provided a photograph of defendant from a prior immigration arrest (Tr. at 15, 64; P. Ex. 5). The Platte City police officers stated that they had keys that had previously been provided to them by the apartment complex management to gain entry into the apartment buildings if necessary (Tr. at 17, 42). The doors on the exterior of the apartment building are typically kept locked (Tr. at 17). There is a buzzer system to gain entry into the common areas of the apartment building (Tr. at 18). The apartment building managers wanted the police to have access to the buildings with a key so that in the event police needed to enter the building, they would not need to damage the property to gain entry (Tr. at 17-18).

5.      Special Agent Lindsey showed all of the law enforcement officers an aerial photograph of the apartment building to make sure everyone knew which building was defendant's, and he also showed them on the photograph where defendant's truck was parked (Tr. at 19). The Platte City officers provided the building key to Special Agent Lindsey who gave it to Special Agent Jose Covarrubias (Tr. at 21, 42, 64).

6.      All of the law enforcement officers went together to defendant's apartment (Tr. at 13-14). Special Agents Lindsey and Edgar Jones were in a vehicle about 8 or 9 parking spaces north of the building entrance (Tr. at 21). They were watching the windows and sliding doors on the lowest floor to make sure no one escaped (Tr. at 22). The two Platte City officers were in a marked patrol car (Tr. at 22). One agent stayed outside on the south end of the building (Tr. at 22). The other agents used the management key to enter the common area of the apartment building (Tr. at 22). Special Agents Timothy Kixmiller and Tim Ditter went to the apartment door; Special

5

Agent Covarrubias went inside the building but did not approach the apartment door (Tr. at 35, 64). He waited at the end of the hallway on a landing (Tr. at 42, 64). Special Agent Ditter speaks fluent Spanish (Tr. at 39). He uses his Spanish in his work, and he speaks it at home, as his wife is from Mexico (Tr. at 39, 57). Special Agents Ditter, Kixmiller and Covarrubias were wearing body armor with "Police" markings (Tr. at 40-41).

7.      Special Agents Ditter and Kixmiller went to defendant's apartment door and each stood to the side of the door (Tr. at 41, 65). Neither had their guns drawn (Tr. at 41, 65, 72). Group Supervisor Mark Fox pushed the buzzer for defendant's apartment from the outside of the apartment building (Tr. at 42, 65). Special Agents Ditter and Kixmiller could hear the buzzer sounding inside defendant's apartment (Tr. at 42). Special Agent Fox again pushed the buzzer, and Special Agents Ditter and Kixmiller began to hear movement from inside the apartment (Tr. at 42-43).

8.      When the apartment door opened, Special Agents Ditter and Kixmiller stepped into clear view and introduced themselves as special agents with Homeland Security (Tr. at 43). They showed their badges and credentials (Tr. at 43). They did not have their guns drawn (Tr. at 43, 65, 68). Special Agent Ditter asked the man at the door (later determined to be Juan Maldonado) if he understood, and he indicated that he did not (Tr. at 43, 58). Special Agent Ditter asked Mr. Maldonado if he speaks English, and he indicated that he did not; he said he speaks Spanish (Tr. at 43). Special Agent Covarrubias could not hear what was being said, but he could see that the agents were talking to someone who had answered the door (Tr. at 66, 70, 71).

9.     Defendant did not come to the door, and the special agents did not know Mr. Maldonado (Tr. at 44).  They knew Mr. Maldonado was not defendant (Tr. at 44).

10.     Special Agent Ditter again showed his badge and credentials and, speaking in Spanish, introduced himself and Special Agent Kixmiller as special agents with Homeland Security (Tr. at 44, 56).  Special Agent Kixmiller showed his badge and credentials but speaks very limited Spanish so he said nothing (Tr. at 44, 56).  Special Agent Ditter asked in Spanish whether Mr. Maldonado understood, and he said he did (Tr. at 45, 58).  The rest of the conversation occurred in Spanish (Tr. at 56).  At no time did Special Agent Ditter suspect that Mr. Maldonado was not understanding their Spanish conversation (Tr. at 58).  Special Agent Ditter asked Mr. Maldonado for the country of his citizenship, and he said he was from Mexico (Tr. at 45, 56, 60).  They later learned that Mr. Maldonado was from Guatemala (Tr. at 77).  Special Agent Ditter asked if Mr. Maldonado had documents to be in the United States, and he said he did not (Tr. at 45, 56, 60).  Special Agent Ditter asked if the special agents could come inside the apartment and talk, and Mr. Maldonado said, "Si," meaning "yes" (Tr. at 45, 59, 60).

11.     It appeared to Special Agent Ditter that Mr. Maldonado had just awakened -- he was only partially dressed and appeared as though he had just gotten out of bed (Tr. at 45).  It appeared that he lived there, and the special agents assumed that he did live there (Tr. at 45).

12.     Once inside the apartment, Special Agent Ditter asked if anyone else was present in the apartment (Tr. at 46, 59).  Mr. Maldonado indicated that a friend was there, and he pointed toward the back of the apartment (Tr. at 46, 59).  Special Agent

7

Ditter could see a closed door at the end of a hallway (Tr. at 46). He told Mr.

Maldonado that he was going to perform a protective sweep for everyone's safety, to

check and see if anyone was there to make it safe for everyone (Tr. at 46). Neither

special agent had his gun drawn (Tr. at 46). While Special Agent Ditter was talking to

Mr. Maldonado, Special Agent Kixmiller was standing next to Special Agent Ditter,

focusing on the closed door at the end of the hallway (Tr. at 46).

      13.     There had been no yelling or shouting among anyone present; the

encounter was described as very friendly and cooperative (Tr. at 49, 65). Mr.

Maldonado was not put in handcuffs (Tr. at 58, 60). He was not free to leave because

the agents believed he was in the United States illegally; however, the special agents

did not inform Mr. Maldonado that he was under arrest because it was possible he had

a family member in the United States from whom he had derived citizenship (Tr. at 59-

61).

      14.     Special Agent Covarrubias, who speaks Spanish as his first language,

had entered the apartment behind the other special agents, and he stayed with Mr.

Maldonado while Special Agents Ditter and Kixmiller conducted a cursory sweep (Tr. at

47, 63, 66). The kitchen and living room were visible from where everyone had been

standing (Tr. at 47). Special Agents Ditter and Kixmiller went down the hallway and

observed a bedroom on the right; Special Agent Kixmiller did a cursory sweep of that

bedroom (Tr. at 48). Special Agent Ditter conducted a cursory sweep of the bathroom

which had a door entering into the bedroom whose door was closed (Tr. at 48). When

the protective sweep began, both of the special agents took their guns out of the holster

(Tr. at 48). They did not point their guns at Mr. Maldonado -- they held them in the direction of the protective sweep as it was occurring (Tr. at 48, 68).

15.     The doors in the hallway and in the bathroom, both leading to the back bedroom, were locked (Tr. at 49). Special Agent Ditter was at the bathroom door leading into the bedroom, and Special Agent Kixmiller was at the door in the hallway (Tr. at 51). The special agents announced, "Police! Policia!" in both English and Spanish while knocking (Tr. at 48-49). Eventually they heard movement inside the bedroom (Tr. at 49). Defendant came to the door in the hallway and opened it (Tr. at 49, 51). Because their guns had been drawn during the protective sweep, their guns were still drawn when defendant opened the bedroom door (Tr. at 49). They recognized him as Francisco Ortega-Montalvo from the picture they had seen before entering the apartment, and he had the same tattoo across his shoulders (the tattoo said, "Ortega") as was indicated in the file they had previously reviewed (Tr. at 23, 49, 52; P. Ex. 5).

16.     Defendant appeared surprised when he opened the bedroom door (Tr. at 68-69). Special Agent Kixmiller said, "Police, hands up" (Tr. at 51). Defendant complied (Tr. at 51). Defendant was turned against the wall, patted for weapons, and handcuffed (Tr. at 49). Special Agent Kixmiller holstered his gun before handcuffing defendant (Tr. at 52). Defendant was taken to the front of the apartment, and Special Agent Ditter completed the protective sweep of that last bedroom to make sure no one else was present (Tr. at 49). Once the protective sweep was done and no one else was found, Special Agent Ditter holstered his gun (Tr. at 50, 52).

9

17.     While the protective sweep was occurring, Special Agent Covarrubias spoke in Spanish to Mr. Maldonado and confirmed that he was in the United States illegally (Tr. at 66, 75).  Mr. Maldonado did not appear nervous, he did not yell, he was cooperative (Tr. at 66).  He answered the questions asked by Special Agent Covarrubias (Tr. at 66).  They stood near the doorway of the apartment until defendant had been taken into custody (Tr. at 76).

18.     Defendant was also described as cooperative (Tr. at 52).  He said that his name was Jerry Ortega (Tr. at 52).  Special Agent Ditter asked defendant if he had any drugs, guns, knives or anything that could hurt someone in the apartment or in his room (Tr. at 50).  He indicated that he did not (Tr. at 50).  Special Agent Ditter asked defendant if they could search his room, and he said they could (Tr. at 50).  Special Agent Covarrubias asked Mr. Maldonado for consent to search his room, and he verbally consented (Tr. at 50).  He was asked if he would consent to a search of the apartment, he said he would; and when he was asked which bedroom was his, he pointed to his bedroom (Tr. at 68-69).  Mr. Maldonado and Special Agent Covarrubias were in the kitchen while Special Agent Ditter was in the living room with defendant (Tr. at 67).

19.     The apartment was searched, and the agents found identification documents in defendant's bedroom (Tr. at 50).  Three identification documents were seized, all bearing the name Francisco Ortega-Montalvo, including an Arkansas drivers license and two documents from Mexico (Tr. at 51, 68; P. Ex. 2).  Nothing besides those three identification documents were seized from the apartment (Tr. at 68).

10

20.     The only yelling that occurred during the entire incident was the special agents yelling, "police" as they conducted the security sweep (Tr. at 69).

21.     Both defendant and Mr. Maldonado were arrested and transported to the Enforcement Removal Operations Office (Tr. at 23, 69). Special Agents Lindsey and Jones transported defendant (Tr. at 23). There is a small detention center there along with facilities for running fingerprint checks (Tr. at 23). Defendant was described as calm, low-key, cooperative, friendly, not belligerent or mean in any way (Tr. at 24). Special Agent Lindsey communicated in English with defendant during the entire incident (Tr. at 24). Defendant appeared to have no difficulty communicating in English (Tr. at 25). His comments were appropriate and responsive (Tr. at 25). Special Agent Lindsey took defendant's fingerprints and ran them through an automated fingerprint identification system (Tr. at 26). The comparison revealed a match to Francisco Ortega-Montalvo who had been convicted of aggravated assault and deported (Tr. at 26-27).

22.     Special Agent Lindsey advised defendant of his <u>Miranda</u> rights by reading from a Department of Homeland Security Record of Sworn Affidavit (Tr. at 24-25; P. Ex. 3). Defendant signed and initialed the form, waiving his <u>Miranda</u> rights and swearing to tell the truth, the whole truth and nothing but the truth (Tr. at 26; P. Ex. 3). Defendant's fingerprint was placed over the top of his signature (Tr. at 26). Defendant was also advised of his consular rights, and defendant stated that he did not need the agents to contact his consular representatives (Tr. at 27).

23.     Special Agent Lindsey asked defendant if he would be willing to make a statement regarding being in the United States legally or illegally, and defendant agreed

11

to make a statement (Tr. at 27). He admitted that he had been deported the previous year and that he had illegally reentered the United States that same year (P. Ex. 4).

24.    The only time Special Agent Lindsey or Special Agent Jones had their weapons out of the holster was at the Enforcement and Removal Office -- because defendant had been taken to a secure area, the agents' weapons had to be locked up before they went into the actual detention area (Tr. at 29). Special Agent Lindsey never observed any other agent or officer with a gun drawn; all weapons were holstered at all times in his presence[1] (Tr. at 30).

25.    Juan Maldonado testified that he is from Guatemala (Tr. at 79). When asked what language he speaks, he said, "Spanish and I speak some dialect." (Tr. at 79). He has been in the United States illegally for 6 1/2 years (Tr. at 79). He works at Maria's Mexican Restaurant with defendant (Tr. at 79).

26.    Before Mr. Maldonado met defendant, he was living in a trailer in Kansas with some friends (Tr. at 79-80). He met defendant while looking for a job, and defendant said he had an extra room in his apartment (Tr. at 80). At the time of the arrest and search, Mr. Maldonado was living in the apartment with defendant (Tr. at 80). He knows defendant as both Jerry and Francisco (Tr. at 80).

27.    On the day of the arrest, officers were buzzing and also knocking (Tr. at 81). When he opened the door, he saw officers who were pointing guns at him (Tr. at 81). They did not say anything to him (Tr. at 81). Mr. Maldonado thought it was a friend at the door (Tr. at 81).

---

[1]Special Agent Lindsey remained outside of the apartment building during the entire incident that day.

28.     Mr. Maldonado exited the apartment and went into the hallway (Tr. at 81). When he saw the agents with their guns, he was told not to move (Tr. at 81). He was standing in the hallway when the agents pulled their guns on him (Tr. at 81). One agent grabbed him by the back of his neck and pushed him against the wall (Tr. at 81-82). The agent was pointing his gun at Mr. Maldonado while the other agents entered the apartment (Tr. at 82). The wall he was pushed against was in the hall outside of the apartment (Tr. at 82). The other agents did not ask him if they could go inside his apartment, they just went inside (Tr. at 82).

29.     The agents asked who else lived there, and Mr. Maldonado said, "just my friend" (Tr. at 82). He identified his friend as Francisco Ortega (Tr. at 82). He was still in the hallway up against the wall when this conversation occurred, and the gun was still pointed at him (Tr. at 82). When the other agents went back to get defendant out of his bedroom, Mr. Maldonado was brought back inside the apartment (Tr. at 82).

30.     None of the agents ever asked Mr. Maldonado if he was in the country legally or illegally, not while he was in the hall and not while he was in the apartment (Tr. at 82-83). He had no identification with him, the agents got it out of his bedroom (Tr. at 83). They did not return his identification to him (Tr. at 83). They handcuffed him and put him on the couch (Tr. at 83). They asked if they could search the apartment (Tr. at 83). They asked if the men had marijuana, cocaine or guns, and defendant and Mr. Maldonado said that they did not have anything (Tr. at 83).

31.     To the extent that it differs from findings of fact number 1 through 24, I do not find Mr. Maldonado's testimony to be credible for the following reasons:

a. Every agent's testimony was completely consistent with one another's, even in the smallest detail, and the witness rule had been invoked so none of them heard any other agent's testimony.

b. Mr. Maldonado admittedly entered the United States illegally, worked illegally, and told the agents he was from Mexico when he was really from Guatemala, all of which reflect negatively on his credibility.

c. Mr. Maldonado testified that when he opened the door, the agents were pointing guns at him. He later testified that he was in the hallway when the agents pulled guns on him. This inconsistence reflects negatively on his credibility.

d. Mr. Maldonado testified that the agents did not say anything to him when he answered the door. However, Special Agent Ditter testified that he identified himself both in English and in Spanish, that he asked Mr. Maldonado about his ability to speak English, and that he asked Mr. Maldonado if he could come inside; and Special Agent Covarrubias testified that he could see Special Agent Ditter talking to Mr. Maldonado at the apartment door. Further, although Mr. Maldonado testified that the agents said "nothing" to him at the door, he later testified that they told him not to move, which is inconsistent with his testimony that they said nothing.

e. Mr. Maldonado admitted that the agents asked permission to search his apartment; he never denied having given them consent to search. He also never testified that he did not understand what was being said to him when the agents were speaking to him in Spanish, despite defense counsel's

14

argument that Mr. Maldonado's dialect preventing him from fully understanding what was being said.

## III.   *SUBSEQUENT BRIEFING*

After the hearing, defendant filed supplemental suggestions in support of his motion to suppress (document number 33).  Defendant argues that Mr. Maldonado's testimony that he was not asked for consent to allow the agents inside his apartment was credible.  He alternatively argues that if the court should find that testimony not credible, then Mr. Maldonado's consent should be found involuntary.  Defendant argues that Mr. Maldonado's consent was not valid because the agents' deception amounted to implied coercion -- the agents told Mr. Maldonado they wanted to come inside to talk, not to arrest defendant, which was their true intention. He further argues that his own consent to search the apartment and his bedroom was not valid because he was in custody and simply submitted to the agents' show of authority.  Finally, defendant argues that the subsequent seizure of the identification documents, defendant's statements at the apartment and after waving his <u>Miranda</u> rights, and his fingerprints are fruits of the illegal entry and that any potential testimony about the arrest and search should be suppressed as a result.

The government filed a response to defendant's supplemental suggestions (document number 34) arguing that even if the entry were found to be illegal, the subsequent fingerprinting and statement are not fruits, citing <u>New York v. Harris</u>, 495 U.S. 14, 18 (1990), in which the Supreme Court held that an unlawful entry into a home despite having probable cause to arrest does not mean the defendant is immune from prosecution because his person is the fruit of an illegal arrest.  The government also

Case 5:15-cr-06001-BP   Document 37   Filed 07/29/15   Page 15 of 24

points out that all of the cases relied on by the defendant in his supplemental suggestions are distinguishable because in those cases the court found that the arrest of the suspect was made without probable cause, which is not the case here.

## IV.    ENTRY

Defendant does not challenge the authority of the agents to enter his apartment building using the key provided by the apartment manager, and indeed such entry was lawful.  The Eighth Circuit has consistently held that tenants of multifamily dwellings have no legitimate expectation of privacy in common or shared areas.  United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002); United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999); United States v. McGrane, 746 F.2d 632, 634 (8th Cir. 1999); United States v. Eisler, 567 F.2d 814, 817 (8th Cir. 1977) (no reasonable expectation of privacy in hallway of apartment building; locks on the doors of the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways).

Defendant first argues that Mr. Maldonado's testimony that he did not provide consent to enter the apartment is credible.  For the reasons discussed in paragraph 31 above, this argument is without merit.  I do not find Mr. Maldonado's testimony credible. I do find credible the testimony of the agents that they asked if they could come inside and Mr. Maldonado permitted their entry.

Defendant next argues that Mr. Maldonado's consent to enter was invalid because the agents used deception by telling him that they wanted to come inside to talk rather than disclosing their true intention of arresting defendant, who was believed to be Mr. Maldonado's roommate.

16

The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citing Payton v. New York, 445 U.S. 573 (1980)). However, the Fourth Amendment is not violated if consent has been obtained from a person who possesses common authority over the premises, and that consent is given voluntarily and without coercion. Id. (citing United States v. Matlock, 415 U.S. 164, 171 (1974)); United States v. Briley, 726 F.2d 1301, 1304 (8th Cir. 1984). It is undisputed that Mr. Maldonado had common authority over the premises.

Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

In support of his argument, defendant cites United States v. Lopez-Lopez, 443 F. Supp. 2d 1130, 1132-1134 (W.D. Mo. 2006), and United States v. Quintero, 648 F.3d 660, 670 (8th Cir. 2011). Both of those cases are distinguishable.

In Lopez-Lopez, police had information that methamphetamine was being stored in the defendant's residence, specifically that drugs were being hidden behind a wall. They went to the defendant's residence and told him they needed to retrieve his identification paperwork which they had previously "skimmed" because they needed to verify his identity. They told him that they knew there were no drugs in the residence. The defendant consented to a search of his residence, and police recovered drugs and paraphernalia from a tissue box and from inside a black bag hidden inside the wall behind a picture. The district court found that the seizure of these items was beyond the consent to search and was therefore illegal.

17

A consent search is reasonable only if it stays within the limits of the actual consent. "Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." The standard for measuring the scope of a suspect's consent is "that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Here, Defendant consented to the search of his residence for identification papers. It is hardly reasonable to expect that the scope of the consent encompassed items hidden in a Kleenex box and in a bag inside the wall behind a picture. . . .

From the outset of the interrogation, the police intended to deceive Defendant and impermissibly exceed the scope of Defendant's consent. The whole of the interrogation was premised on a series of lies. The detective who obtained consent to search lied to the defendant regarding: (1) the intended purpose of the search; (2) the detectives' knowledge of drugs being in the residence; and (3) the fact whether the detective shuffled through the documents he told Defendant he was going back to get, implying that he would be searching only that portion of the residence where the documents had initially been found. Such affirmative misrepresentations are nothing more than consent through deception, and accordingly constitute implied coercion.

United States v. Lopez-Lopez, 443 F. Supp. 2d at 1132-1134 (citations omitted).

In United States v. Quintero, 648 F.3d at 670, the Eighth Circuit compared the

coercive actions of police with those in United States v. Drayton, 635 U.S. 194, 204

(2002):

The record supports the court's conclusion as to the coercive atmosphere, which, coupled with the officers' misrepresentations and Michelle's repeated expressions of fear, demonstrated her consent was involuntary. We find illustrative the Supreme Court's decision in United States v. Drayton, 536 U.S. 194, 204 (2002), where the Court concluded an encounter was not coercive because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Unlike in Drayton, there were copious facts here supporting coercion. Six individuals, including three officers and two security guards, conducted a late-night knock-and-talk after an inexplicable delay, rousting the Quinteros from sleep. Weber misrepresented his identity at the door, commanded Michelle to get dressed and come to the door multiple times, and took several minutes to repeatedly badger her for consent to search the room in the face of her hesitation, as well as her repeated statements to the effect that the officers were "scaring the shit out of

[her]." Weber also falsely told Michelle he only wanted to take "a quick peek around," when he endeavored to conduct a full-scale search of the room and the Quinteros' belongings. To this end, Weber admitted his forceful tactics were the only way he could search the room because he had no probable cause or exigent circumstances. Under these circumstances, the court did not err in concluding Michelle's consent was the product of duress and coercion, rather than of her own free will.

The factual scenarios in the cases relied on by defendant are wholly inconsistent with the factual scenario in the case before me. To the contrary, the case discussed by the Eighth Circuit in <u>Quintero</u> is more in line with the agents' actions in this case. In that case the Court noted that there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice -- all of which resulted in the Court finding that there was "nothing coercive [or] confrontational about the encounter." <u>United States v. Drayton</u>, 536 U.S. at 204. In the case before me, there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, and not even an authoritative tone of voice. The encounter between the agents and Mr. Maldonado was not coercive.

Contrary to defendant's argument, when police conduct a knock-and-talk, they are not limited to "talking" for the duration of the encounter. In <u>United States v. Crisolis-Gonzalez</u>, 742 F.3d 830, 835 (8th Cir. 2014), Homeland Security received information from a confidential informant that Crisolis-Gonzalez had entered the country illegally, was involved in drug trafficking, and had possibly purchased a firearm. They went to the defendant's apartment to conduct a knock and talk. The agent knocked and asked the person who answered whether he could come in to speak with him. The man

19

agreed and stepped aside to let the agents in.  When the agent asked if anyone else

was in the home, the man paused and turned his head slightly toward the hallway.

Interpreting the man's hesitance and slight head turn as indicating that other people

were in the residence, the agents drew their guns and informed the man they were

going to check the apartment for other people.  They walked down the hall yelling

"police!" and when Crisolis-Gonzalez came out of a bedroom with his hands up, he was

handcuffed and taken to the living room.  Crisolis-Gonzalez argued that the consent to

enter was coerced.

> Indeed, "'[m]isrepresentations about the nature of an investigation may be evidence of coercion'" and can certainly "invalidate the consent if the consent was given in reliance on the officer's deceit." However, we do not require officers to "'gratuitously advertis[e] [their] every move to anyone [they] might encounter.'"

> We find no evidence of misrepresentation in Agent Covarrubias's request to enter the apartment.  Importantly, Reyes-Savedra agreed to let the agents inside without further inquiry as to the nature of the visit.  And, like the district court, we find nothing misleading about Agent Covarrubias's request to speak with Reyes-Savedra because it was consistent with the overall goal of locating Crisolis-Gonzalez. . . .

(citations omitted).

> In addition to finding that the consent to enter the residence was not coerced, the

Eighth Circuit held that the protective sweep was lawful.

> A protective sweep is permitted under the Fourth Amendment when an officer has "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Crisolis-Gonzalez claims that the protective sweep was unlawful due to the absence of an initial arrest and the lack of any articulable facts suggesting the agents were in danger.  We disagree. . . .

> The agents had been informed that Crisolis-Gonzalez was involved in drugs and that he may have purchased a gun.  The hesitance from both Reyes-Savedra and Lara-Andres when Agent Covarrubias asked if others were in the house

20

ignited the agents' suspicion as to the potential danger. Reyes-Savedra's slight head turn to the hallway in response to being asked whether anyone else was in the apartment created further suspicion that other individuals were present. We hold these facts sufficient to alert the agents as to the possibility that the apartment harbored dangerous individuals. Thus, the agents conducted a lawful protective sweep of the apartment.

United States v. Crisolis-Gonzalez, 742 F.3d at 836 (citations omitted).

In United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008), the

defendant's argument that a knock and talk resulted in coercive consent to enter was

likewise rejected.

First, it does not violate the Fourth Amendment merely to knock on a door without probable cause. Officer Terviel and Uhre stood in a public hallway and knocked on the door. "[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors -- such as driveways, walkways, or similar passageways." While a police attempt to "knock and talk" can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up, in this case there are no facts that would show that Blue Bird had reason to feel she had to open up. The encounter happened in mid-day, Terviel did not command her to open the door, nor was there any suggestion that his knocking was unusually persistent. The district court found that Blue Bird opened the door of the motel room of her own accord, and that finding is not clearly erroneous.

(citations omitted).

In United States v. Briley, 726 F.3d 1301 (8th Cir. 1984), the defendant argued

that his girlfriend's consent to permit police to enter the residence was invalid because

the officers only told her they wanted to talk to Briley, they did not say they wanted to

arrest him. The Eighth Circuit rejected that argument.

In contrast to the government's assertion that deception is permissible in obtaining consent, we have stated that "[m]isrepresentations about the nature of an investigation may be evidence of coercion." The misrepresentation may even invalidate the consent if the consent was given in reliance on the officer's deceit.

However, there was no such deceitful misrepresentation here. The officers'
cryptic statement that they had important matters to discuss with Briley does not
appear to have been said with the intention of tricking Rivera into consenting to
an entry. . . .   When the officers, without being explicit, said they wanted to see
Briley on an important matter Rivera sought no further elaboration. The officers
had a right to go about their duties "without gratuitously advertising [their] every
move to anyone [they] might encounter...."

Moreover, our examination of the totality of the circumstances leads us to
conclude that Rivera's consent was voluntary. The officers did not misrepresent
the fact that they had no search or arrest warrant. Nor did they threaten to
obtain a search or arrest warrant if consent were withheld.

Id. at 1304-1305 (citations omitted).

Here the only "evidence" that Mr. Maldonado's consent to enter the apartment

was coerced is the fact that the agents did not "gratuitously advertise their every move"

to him, i.e., that they did not gratuitously inform Mr. Maldonado that they were looking

for defendant and suspected that he was in the country illegally. This is woefully

insufficient for a finding of coercion.

Based on all of the above, I find that Mr. Maldonado's consent to permit the

agents to enter the apartment was given voluntarily and without coercion, and that the

subsequent protective sweep of the apartment was lawful.

## V.   DEFENDANT'S CONSENT TO SEARCH HIS BEDROOM

Defendant argues that his consent to search his bedroom was involuntary

because he was in custody and simply submitted to the agents' show of authority. This

argument is without merit -- there is no evidence before me that defendant's consent

was involuntary. The undisputed evidence regarding defendant's consent is as follows:

Defendant was described as cooperative. Special Agent Ditter asked defendant if he

had any drugs, guns, knives or anything that could hurt someone in the apartment or in

22

his room, and he indicated that he did not. Special Agent Ditter asked defendant if they could search his room, and he said they could. Defendant did not testify, and Mr. Maldonado testified that the agents asked for consent to search the apartment -- he did not testify that either he or defendant refused to consent.

When a suspect is asked for consent to search after having been taken into custody, the consent to search is not invalid where there is no overt act or threat of force against the suspect, no promises were made to him, there is no indication of more subtle forms of coercion that might flaw his judgement, and the consent was not given while in the confines of a police station, even if the suspect is not informed that he has a right to refuse consent. United States v. Watson, 423 U.S. 411, 424 (1976). "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." Id.

Defendant fails to suggest any fact which would lead to the conclusion that his consent to search his bedroom was involuntary other than the fact that he was in custody. This argument is without merit.

## VI.    CONCLUSION

Because defendant's remaining arguments rely on a finding that the agent's entry into the apartment violated his constitutional rights, I find them to be without merit -- if there is no poisonous tree, there can be no fruit of the poisonous tree.

Based on all of the above, I find that the agents lawfully entered defendant's residence and lawfully conducted a security sweep, and that because there was no constitutional violation, there were no fruits of an illegal entry. I further find that defendant's consent to search his bedroom was valid. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 29, 2015